## In re FELDSTEIN.

(Circuit Court of Appeals, Second Circuit. April 8, 1902.)

No. 130.

1. BANKRUPTS—BOOKS OF ACCOUNT—SUFFICIENCY.

A bankrupt, who merely enters loans made to him by members of his family in private personal memorandum books, always kept in his personal custody and concealed by him from every one, does not comply with the provision of the bankruptcy act requiring him to keep "books of account or records."

**2. SAME—"IN CONTEMPLATION OF BANKRUPTCY."**

Failure of a bankrupt to keep the requisite books of account must be deemed to have been "in contemplation of bankruptcy," within Bankr. Act, § 14b, providing that a bankrupt's discharge shall be refused if, with fraudulent intent and "in contemplation of bankruptcy," he fails to keep books of account, where for at least a year prior to his failure his condition was one of such hopeless insolvency that he must be presumed to have known it.

**3. SAME—"FRAUDULENT INTENT."**

Failure of a bankrupt to keep the requisite books of account must be deemed to have been with "fraudulent intent to conceal his true financial condition," within Bankr. Act, § 14b, providing that a bankrupt's discharge shall be refused if with "fraudulent intent," etc., and in contemplation of bankruptcy, he fails to keep books of account, where his testimony conceded an intent to conceal his true condition, and it appeared from the evidence that he knew he was insolvent and on the verge of failure.

**4. SAME—FAILURE TO KEEP BOOKS.**

The fact that loans made to a bankrupt and not entered by him in his regular account books were made before the bankrupt act was passed did not excuse his failure to enter them as required by the bankrupt act.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal by the bankrupt from an order of the district court, Southern district of New York (108 Fed. 794), refusing the discharge of the bankrupt.

H. B. Twombly, for appellant.

Emmanuel Blumenstiel, for appellees.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. The bankrupt was in the silk business under the name of A. Feldstein & Co. He had no partner. Upon application for discharge the only specifications which were seriously pressed were those relating to the failure to keep proper books of account and the concealment of assets from the trustee. The referee found the latter specification not sustained, but recommended that the discharge be refused on the ground that "with fraudulent intent to conceal his true financial condition, and in contemplation of bankruptcy, the bankrupt had failed to keep books of account or records from which his true financial condition could be ascertained." The district court sustained the referee. The referee, in an exhaustive report, found this conclusion on several different assignments of improper bookkeeping. Inasmuch as we do not in all respects agree with his conclusions, but yet find in one of these assignments sufficient to sustain the specification, the discussion of the question presented on this appeal may be much shortened.

A few excerpts from the referee's report will indicate the general situation prior to May 7, 1900, when the bankrupt's voluntary petition was filed:

"The bankrupt was insolvent to the amount of $75,000 and more on January 1, 1898, and more than $175,000 on December 31, 1898, and more than $360,000 on December 31, 1899, and more than $500,000 on May 1, 1900, without regard to debts owing to his wife and her family, amounting to more than $90,000. Between September 19, 1898, and April 12, 1900, during

all or part of which time the bankrupt was hopelessly insolvent, he lost in gambling at roulette, etc., the enormous sum of more than one hundred and sixty thousand dollars in gambling houses in New York City, and paid the same out of moneys drawn from his business, in addition to about the sum of seventy-five thousand dollars lost in speculations in stocks."

Counsel for the appellant contests the statement that Feldstein was insolvent $75,000 in January, 1898, upon the theory that $59,000 of his indebtedness at that time was to E. Zellweger & Co., of Bache, Switzerland, a concern which appears in the bankrupt's schedules as his creditor to the amount of $320,000. It is contended that Feldstein was a general partner in this concern, and that by counting certain possible interests in that concern as assets the deficiency of $75,000 on January 1, 1898, would be practically wiped out. It will not be necessary, however, to go into this question of partnership, because the $75,000, as the accountant testifies, did not include the $90,000 due for loans made to Feldstein by members of his family. Counting that sum as a liability, he was undoubtedly insolvent in January, 1898, and his condition grew rapidly worse until the crash came in May, 1900. It is manifest from the testimony that certainly by the end of the year 1898 he was in a condition of hopeless insolvency; and it is difficult to escape the conviction that he knew it, and that, as the referee found, knowing he "could not meet his obligations, he turned to gambling and stock speculations in hopes of retrieving his losses, but went from bad to worse, and rapidly used up his assets and the money of his creditors."

The bankrupt had a regular set of books kept by a bookkeeper during his entire business career, and under his directions and instructions. These books comprised ledger, cash book, sales books, check book, order book, storage book, stock book, invoice book, and letter-press copy book. There was no book of bills receivable in usual form, but four small books were produced, in which there were memoranda of notes received from customers, with the disposition thereof. The entries in these small memorandum books were made by the bookkeeper. The usual records, such as invoices, returned checks, correspondence, accounts, etc., were also kept. And there was produced on the hearing a personal check book of the bankrupt, with returned checks. As stated before, the referee and the district court found that the way in which the accounts were kept, in several particulars, was calculated to mislead and deceive as to the capital of the bankrupt invested in the business, which, under this system of bookkeeping, appeared at all times to be much larger than it was in fact; and that the bankrupt has thus "failed to keep books of account or records from which his true condition might be ascertained." It will be necessary only to discuss the indebtedness to his family. In the schedules filed by the bankrupt, in the list of unsecured creditors, there appear the names of Anna C. Feldstein, $75,000; estate of Tabitha Sierck, $9,000; C. W. Sierck, $10,000,—all for "money loaned." Anna C. was the bankrupt's wife, Tabitha Sierck was his mother-in-law, and C. W. Sierck, his brother-in-law. From the proofs of claim it appears that in 1892 Tabitha Sierck loaned Feldstein $35,000, taking his promissory note there-

for. After her death in January, 1896, and prior to November, 1897, he paid to her administrator $26,000 of this amount, leaving $9,000 still due. This $26,000 had been loaned to him by his wife, and she had, in addition thereto, between December 23, 1895, and December 31, 1896, loaned him other sums, amounting (with the $26,000) to $75,000. The $10,000 due to C. W. Sierck was loaned to Feldstein January 22, 1892. In none of the bankrupt's books above enumerated,—in none of the records or papers kept in his business,—is there the slightest indication of the existence of any of these claims against him. Any one examining the books, whether an ordinary person having a general knowledge of accounts or a most skillful and competent accountant, would inevitably have reached the conclusion that Feldstein was $90,000 better off financially than he really was. Counsel for the appellant asserts in his brief that "the Anna C. Feldstein running account * * * was entered in the check books of the bankrupt and the checks were all kept so that Klaw (the expert accountant) was able to make a complete and exact statement from these records of the same account"; but examination of the testimony to which he refers does not bear out this assertion. We find no such statement made up from such records. Certain checks drawn by Sierck, administrator, to the order of Anna C., and indorsed by her and by the bankrupt, were shown to him, and he testified that they "appeared in the deposits of his check book," but the returned checks of "Sierck, administrator," were no part of the records of the business of A. Feldstein & Co., and there is no evidence to show that they were kept by that concern. Except for an assertion as to two certain small memorandum books, the bankrupt admitted—as he had to admit—that there was nothing in the books or records to indicate that he owed any of these people (members of his family) the amounts set forth in the schedules. The bankrupt insisted that he had made full entries as to these loans and the interest upon them, and also statements as to transactions with stockbrokers, in two small memorandum books. These books were never produced. The bankrupt's story is that they were locked up in his desk in his private office at the time of the failure; that when he came there afterwards the desk had been broken open, and the books had disappeared. The trustee, who broke open the desk, testified that he saw no such books; that he preserved all he found there, except some printed advertising matter. Schweizer, the bookkeeper, who was present at the time, corroborates him. There is no conceivable reason why any one should have made away with these memorandum books, if they were there; and we are inclined to the opinion that no such books were in the desk on the day of the failure. But if they were, it makes no difference. The bankrupt himself testified that the amounts due his wife and the Siercks were never entered in the business books of A. Feldstein & Co., only in these two small memorandum books, which apparently no other eye but his ever saw. He alone kept them; the bookkeeper never made a single entry in them,—never saw them. They were kept secret and apart,—his private, personal memoranda; always in his personal custody, concealed from every one. This cer-

tainly is not the "[keeping] of books of account or records" which the bankrupt act calls for. They were no more a part of such books and records than if the bankrupt had noted his indebtedness to his family on the back of a visiting card and kept it in his pocketbook, or had written it on the fly leaf of a book in his library.

It is necessary that the failure to keep books or records must have been "with fraudulent intent to conceal his true financial condition," and "in contemplation of bankruptcy." Bankr. Act, § 14b. The bankrupt testified that he did not know he was insolvent till April, 1900, within a month prior to the bankruptcy; but the court is not constrained to accept his statement as controlling. If such were the rule, the provisions of section 14b would be futile. For at least a year prior to his failure his condition was one of such hopeless insolvency that he must be presumed to have known it. Indeed, the only charitable explanation of his testimony is that, during that period of reckless plunging, he was cherishing the hope that some run of luck at the gaming table or on the stock market would bring him money from outside his business operations which would enable him to restore his depleted assets. When he let his books and records remain without any entry in them to disclose these debts, amounting to $90,000, during this period, when he must have known bankruptcy was imminent, his failure to keep the books and records which the statute required must certainly be held to have been "in contemplation of bankruptcy."

As to "fraudulent intent to conceal his true financial condition": His own testimony concedes an intent to conceal. He neglected to enter these loans in the business books, was careful not to allow the confidential bookkeeper, who kept all the other books, and held a power of attorney to sign checks, to make a single entry in them, nor even to see them, for the express purpose, as he admits, of concealing these loans from every one in any way connected with or employed in the business, so that from the books and records he did keep no one might know what money he borrowed. When the intent to conceal his true financial condition is conceded, and knowledge that he is insolvent and on the verge of failure is brought home to him, it is an irresistible inference that the intent was fraudulent.

We find no force in the suggestion that the loans were made before the bankrupt act was passed, and the failure to enter them in the books or records of the business began then. The referee held that "while he was solvent, and could promptly meet all his obligations, and before the passage of the bankrupt act, he was at liberty to keep his books in any manner he pleased, or to keep no books at all, but when he asks the benefits of the bankrupt act he is bound to show a compliance with its provisions regarding his books as well as any other requirements; but if he kept improper or incorrect books before the passage of the bankrupt act, and to such an extent as to make them improper or insufficient under the act, he should, upon the passage of the act, have altered his system of bookkeeping so as to comply with its requirements, if he ever expected to seek the benefit of its provisions." In this opinion we concur.

The order of the district court is affirmed.