**TABACK et al. v. ARAI et al.**

Circuit Court of Appeals, Third Circuit.
August 2, 1927.

Rehearing Denied September 13, 1927.

No. 3609.

**1. Bankruptcy ⟜414(3)—Evidence held insufficient to warrant refusal of discharge to bankrupt partners for failure to keep books.**

Evidence *held* insufficient to warrant refusal of discharge to bankrupt partners on the grounds that they failed to keep books from which their financial condition could be ascertained, with intent to conceal such condition, or that they obtained credit on a materially false statement in writing, made for the purpose of obtaining credit.

**2. Bankruptcy ⟜409(1)—Carelessness in keeping books while bankrupt is prosperous negatives charge of intent to conceal condition when business is poor.**

Carelessness in keeping books for a long time while bankrupt is prosperous negatives charge of interest to conceal his condition when business becomes poor.

**3. Bankruptcy ⟜409(1)—Intent of bankrupt is test of right to discharge.**

Intent of bankrupt is the touchstone by which his right to discharge must be tested.

**4. Bankruptcy ⟜407(10)—Refusal of discharge held not warranted on the ground of making false financial statement with fraudulent intent.**

A financial statement, made by bankrupts while their business was prosperous and they were not asking for credit, and after which they paid out over $500,000 for goods, *held* not one made for the purpose of defrauding creditors, which warranted refusal of their discharge.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

In Bankruptcy. In the matter of Nathan Taback and Louis Taback, individually and as partners as Taback Bros., bankrupts. From an order denying a discharge on objections of Morimura, Arai & Co. and others, the bankrupts appeal. Reversed, with directions.

Bilder & Bilder, of Newark, N. J. (David H. Bilder and Frederic M. P. Pearse, both of Newark, N. J., of counsel), for appellants.

McDermott, Enright & Carpenter and James D. Carpenter, all of Jersey City, N. J. (Edmonds Putney, of New York City, of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal from an order of the District Court refusing to discharge the bankrupts.

Louis Taback and Nathan Taback, under the firm name of the Taback Bros., were dealers in raw and thrown silk. From some time in 1917 to May 1, 1920, their place of business was at 1133 Broadway, New York City, and from May to September, 1920, it was in Paterson, N. J. For a time the bankrupts conducted a prosperous business, but in 1920 one of the worst panics known in the silk industry occurred, and the price of raw silk dropped from around $15 to $4.50 per pound. The bankrupts had bought and were under contract to buy a great deal of silk when prices were at their peak, and had to dispose of it at a sacrifice. Like many others, they were caught in the slump.

As a result they were unable to pay their bills, and on September 29, 1920, a petition in bankruptcy was filed against them. The case was referred to the late Hon. Frank Van Cleve, referee in bankruptcy. In due time the bankrupts made application for their discharge. The creditors objected, and filed many specifications of objection; but neither the trustee nor any of the creditors prosecuted any of them except Morimura, Arai & Co. Numerous meetings were held and a great deal of testimony was taken in support of these specifications, but they were abandoned one after another, until finally the objecting creditor relied upon two only: (1) That the bankrupts, with *intent to conceal their financial condition*, destroyed, concealed, or failed to keep books of account from which such condition could be ascertained, and (2) that they obtained property on credit upon a materially false statement in writing made by them to a creditor for the purpose of obtaining credit from it.

[1] Did the bankrupts destroy, conceal, or fail to keep books of account from which their financial condition could be ascertained, with intent to conceal such condition? There is no evidence whatever that they destroyed or concealed any books or records. This specification, therefore, is limited to the question of whether or not, with intent to conceal their financial condition, they failed to keep books and records from which such condition might be ascertained. There are two elements to this charge: The first is that their financial condition could not be obtained from the books and records which they kept; and the second is that they failed to keep books from which their financial condition could be ascertained, with intent to conceal such condition. Both elements must be established before a discharge may be denied.

The bankrupts did not have any technical training, or what is known as "book learn-

ing." Only one of them could read or write. The books were kept by an inexperienced and untrained boy; the son of one of the bankrupts; the business being a kind of family affair. He made all the entries in the books, under occasional supervision of an accountant, who knew little or nothing of the details of the business. At the hearings controversy seems to have arisen between the accountants of the bankrupts and the objecting creditor as to the correct method of keeping books, the system used by the bankrupts, and the conclusions to be drawn from the admitted facts. For instance, one accountant says that the "exchange account" is "fictitious," and so he did not consider it in reaching his conclusions; the other says that it is genuine, and the items therein represent actual receipts and disbursements in the ordinary and usual course of the business.

A great deal was made by the objecting creditor of several checks of the bankrupts, because the entries or notations made on the stubs did not correspond with those of the checks, naming, in some cases, a different payee. But this fact indicates carelessness of the boy, rather than intent of the bankrupts to conceal their financial condition, for, if they had intended to conceal what the checks and stubs, when brought together, show, one or both would have been destroyed; but they were both there for inspection, and the differences are without significance. These uneducated men were doing a very large business, and what for them was a tremendous business. At the same time, they were building a large silk mill, which made it necessary for this inexperienced boy to keep such accounts as would have taxed an older and trained bookkeeper. He attempted to keep the following books: A cash book, journal, purchase journal, general ledger, accounts payable ledger, a purchase returns and customers' credit book, bills receivable book, bills payable book, and a check book. Many transactions to which no ulterior motive could be attached were not recorded in any of these books. Consequently the books and business were in somewhat of a jumbled condition, just as might have been expected of untrained men doing a large business, with a young inexperienced and careless son keeping the books. There is now, as above stated, no contention that the bankrupts have any assets concealed, or that they did not turn over to the trustees everything they had. The objecting creditor had to abandon this specification.

[2] The books are an exhibition of carelessness and inefficiency, but the manner in which they were kept did not change from the beginning. Carelessness was just as evident when the business was prosperous as when it was poor, and the panic at its height. Carelessness in keeping books for a long time while a bankrupt is prosperous negatives the charge of failure to keep books with intent to conceal his financial condition when the business becomes poor. Section 2549, Remington on Bankruptcy; In re Feldstein (C. C. A.) 115 F. 259; In re Mackenzie (D. C.) 132 F. 114.

[3] The grounds for refusing a discharge to a bankrupt are statutory. Mere carelessness or stupidity in keeping books does not justify a refusal to discharge. In order to constitute grounds for denying a discharge, the bankrupt must, with intent to conceal his financial condition, have failed to keep books of account from which such condition might be ascertained. Intent of the bankrupt is the touchstone by which his right to a discharge must be tested. This may be gathered in the case at bar from the books of the bankrupts, from the conduct of their business before and during the panic, and from their conduct on the witness stand.

[4] The total purchases made by the bankrupts from the objecting creditor from September, 1919, to September 29, 1920, when the petition in bankruptcy was filed, amounted approximately to $300,000, and from January 7, 1920, when the financial statement was signed, they amounted to $193,000. They paid for all this merchandise, except an amount valued at about $39,000, for which two trade acceptances were given some time in April, 1920. They matured in August following, 7 months after the statement was made. There can be no doubt that these would have been paid, had it not been for the panic in the silk industry. Between January 1, 1920, and September 29, 1920, the bankrupts paid to merchandise creditors $546,-402.71 and in July of that year, in the midst of the silk panic, they paid $73,853.53 to their creditors. They not only turned over to their creditors the receipts as received from their business transactions, but in order to stem the tide they borrowed in the midst of the panic $50,000, which they also paid to their creditors. Careless they might have been, when considered from the point of view of technical bookkeeping; but the actual facts are a great commentary on their intent, and are inexplicable on any other theory than that the bankrupts were honest, and were trying, not to conceal their financial condition by any deceptive system of bookkeeping, but to continue their business and pay their debts.

In addition to an examination and study

of all the books and documentary evidence, and a consideration of the conduct of their business, the special master saw and heard the bankrupts and all the witnesses. He was in the best possible position to pass judgment on the question of intent which is the heart of this case. After fully considering all the facts, he concluded that their intent was honest, and that they did not try to conceal anything. Consequently he recommended a discharge. Neither the District Court nor this court saw the witnesses, and so should not reverse a finding of the master, which is based upon conflicting evidence or inferences and conclusions drawn therefrom. In re Utica Pipe Foundry Co. (D. C.) 221 F. 787; In re Feuer (D. C.) 13 F.(2d) 235; Crawford v. Neal, 144 U. S. 585, 596, 12 S. Ct. 759, 36 L. Ed. 552.

Did the bankrupts obtain property on credit upon a materially false statement in writing, made by them for the purpose of obtaining credit? Up until April, 1920, four months after the statement was made, when the silk panic began to appear, the bankrupts did not need credit and discounted their bills. The fact that the bankrupts paid for silk to the amount of $193,000 after the statement was given, always discounting their bills, and did not accept credit until the panic, shows that they did not make the statement, whether true or false, for the purpose of obtaining credit. "They paid for the merchandise the very next day after such purchases. Every bill was paid to the objecting creditor in about three days after the delivery." When they stopped discounting them, they owed the objecting creditor only $26,000. The two unpaid trade acceptances, which constitute the indebtedness to the objector, were given on April 17 and 27, 1920. Evidently this company was not relying on the statement made nearly four months before, for great changes might have taken place within that time. In re Allendorf (D. C.) 129 F. 981. The property which they obtained as a result of that statement had long since been paid for. If the statement had been made for the purpose of obtaining credit, and defrauding Morimura, Arai & Co. and other creditors, the bankrupts would never have paid them $546,402.71 after it was made. Even if the statement was false, but was not made for the purpose of obtaining credit, it would not prevent a discharge.

The bankrupts contend that the statement was not made for the purpose of obtaining credit, but that in any event it was correct, and substantially stated the facts. The objecting creditor says that the statement was incorrect, and it seeks to prove this fact from the bankrupt's books, which for this purpose it accepts as correct and complete. It took certain entries from the books of account as of January 1, 1920, and from these alone it reached the conclusion that the statement was false, because it did not correspond with what it thinks the books show. Yet, when attacking the books, it says they are not correct, do not set forth the facts, and from them the financial condition of the bankrupts cannot be ascertained. In other words, when seeking to prove that the statement is false, the objecting creditor says that the books are correct, and the statement false; but when seeking to prevent a discharge on account of the books it says that they are incorrect and incomplete, and were so kept by the bankrupts with the intent to conceal their financial condition.

The evidence clearly shows that the books were carelessly or incompetently kept, but we are not satisfied that the carelessness in commission or omission was for the purpose of concealing the financial condition of the bankrupts, or that a consciously false financial statement was made for the purpose of obtaining credit.

The order of the District Court is reversed, with directions to dismiss the exceptions to the special master's report and discharge the bankrupts.