## In re SERVEL.

District Court, D. Idaho, E. D. April 28, 1928.

No. 3517.

Bissell & Bird, of Gooding, Idaho, for objecting creditors.

Merrill & Merrill and Witty & Anderson, all of Pocatello, Idaho, for bankrupt.

CAVANAH, District Judge. Xavier Servel filed a voluntary petition in bankruptcy, and was adjudicated a bankrupt. He filed his petition for discharge on March 8, 1927, within the time required by statute. On March 22, 1927, an order to show cause why the bankrupt should not be discharged was made, and thereafter C. O. Thomas, as receiver of the Bannock County National Bank, and Henry L. Corbett, each filed and presented 10 specifications of objections to the bankrupt's discharge. At the hearing considerable testimony was presented by both the objecting creditors and the bankrupt.

In substance, the specifications of objections may be considered under five groups: (a) Did the bankrupt destroy, cancel, or fail to keep books of account from which his financial condition could be ascertained, with intent to conceal such condition? (b) Did he conceal from the trustee and remove certain personal and real property? (c) Did he, for the purpose of defrauding his creditors, cause to be transferred to one Pierre Servel certain real property, known as the "Tyhee Ranch," and omit the same from his schedule of assets? (d) Did he knowingly make a false oath in giving and refusing to give testimony in the bankruptcy proceedings, by omitting to schedule certain real and personal property? (e) Did he, for the purpose of obtaining credit from the National Bank of Idaho at Pocatello, make a false statement in writing concerning his indebtedness and assets?

The bankrupt came to this country from France in 1903, and immediately engaged in working with sheep. For a time he conducted a prosperous business, until his failure, when one of the worst panics known in the sheep industry occurred, and the price of sheep and wool dropped to such an extent

that he, like many others, was caught in the slump. As a result he was unable to pay his bills, which had grown to large amounts. At times to a small extent he also dealt in cattle, and it became necessary for him to have range for both his sheep and cattle. He had at the time a brother by the name of Pierre Servel, who was engaged also in the cattle business, and with whom he had considerable transactions in the handling of cattle. After the death of his brother, Philomene Servel, the widow of Pierre Servel, continued looking after her husband's affairs, and had some dealings in closing up matters with the bankrupt. It appears that during the long period of time over which the numerous transactions inquired into extended, the bankrupt was a man without education and did not have any technical training, or what is known as "book learning." He knew nothing at all about keeping books, and kept none for himself excepting an attempt to keep a small book in which he recorded the time of his employés and the amount to be paid and paid to them. He would issue and sign checks, the late ones of which were produced, and quite generally he would mark upon them what they were for. All of his business was transacted through banks, and he relied upon the statements, notes, and credits there kept to ascertain his financial condition.

There was kept in the bank by a bookkeeper a detailed account of receipts and disbursements in so far as the dealings with Kasiska were concerned. Kasiska held a mortgage upon his property. These records, together with the bank's statements and a large number of canceled checks and the small book kept by him, were delivered to the trustee. This method of keeping account of his business affairs never changed from the time he commenced business until he failed. He has turned over to the trustee canceled checks relating to a great many of the transactions here complained of, together with his small book of account and the statements and records of the bank. The most that can be said as to the manner in which the bankrupt attempted to keep an account of his business affairs is that he was careless in not keeping himself a complete set of books. His carelessness in that regard was just as evident when his business was prosperous as when it was poor, and it, taken together with the method adopted by him, negatives the charge of failure to keep books with intent to conceal his financial condition when his business became poor. In re Feldstein (C. C. A.) 115 F. 259; Taback v. Arai (C. C. A.) 21 F. (2d) 161; In re MacKenzie (D. C.) 132 F. 114; In re Idzall (D. C.) 96 F. 314.

█ As to the destruction of certain checks and books of account, the evidence only relates to his not having some canceled checks. That seems to be the practice that most people adopt, as they do not keep for any long length of time any of their old canceled checks. It follows, then, after applying the rule just stated, and there being no substantial evidence to support this objection, I am satisfied that the objection to the system adopted by the bankrupt in keeping account of his business should be overruled.

█ Did the bankrupt conceal from the trustee certain personal and real property, and knowingly omit the same from his schedule of assets? This charge involves, first, the concealment of a Lincoln automobile. The test is: Was the property "knowingly and fraudulently concealed"? The evidence is clear that Julia Servel, the wife of the bankrupt, acquired some money from the estate of her father and mother, and also money she had at the time of her marriage, which was her separate property, and also various amounts given to her by her husband, which were all deposited in the account at the bank upon which the bankrupt checked. The Lincoln car was purchased and used by the family for some three years, and the dealer who sold the same understood that Julia Servel was purchasing it when she, at the time of the purchase, turned in a used Cadillac car, then owned by her, as part payment. Here we have a controversy between the objecting creditors and the bankrupt as to the ownership of the car. The wife enters the controversy and insists that she owns it, and has at all times, and especially at the time the schedule was made and filed, possessed and used the property upon the streets of the city.

The mere fact that a bankrupt has omitted to include particular property in his schedule will not be ground for refusing his discharge. It must appear further that the omission was with a fraudulent intent to conceal, and was not the result of a mistake of law or fact. The principle is well laid down in the case of In re Carlson (D. C.) 18 F. (2d) 1003, wherein it is said:

"The other charges are either of false statements in the verified schedules or of fraudulent removal or concealment of property, and all involve the same general question. Such objection cannot be sustained, unless it appears that the conduct of the bankrupt was immoral; that is to say, a mere misstatement of fact in the schedules would not be a sufficient ground for denying discharge, nor would the fact that the bankrupt failed to list one of his items of indebtedness, nor the fact that not all of his property was

turned over or exhibited to the trustee. There must be a willful misstatement of fact under oath, which in effect constitutes perjury. There must be a willful withholding or concealment—in short, actual fraud." In re Morrow (C. C. A.) 97 F. 574; In re Hirsch (D. C.) 96 F. 468; In re De Leeuw (D. C.) 98 F. 408.

This objection, therefore, is also overruled.

■ Under this objection it is further charged that the bankrupt failed to schedule an account which it is claimed was owing to him by Mr. Lott. This was a transaction where the bankrupt sold to Mr. Lott some sheep, which were under a mortgage to Kasiska, and the check of Lott in part payment of the purchase price was by the bankrupt delivered to Kasiska, who was at the time advised that Lott would under his promise pay the balance to Kasiska. The bankrupt had no further interest in the account, nor did he receive any part of it. Without further comment, this objection is also overruled.

■ The next objection is that the bankrupt concealed and failed to include in his original schedule a diamond ring. It appears that it was not so listed, as the bankrupt contends that it is exempt for the reason that it was a birthday present, and that is why he did not mention it. He presented himself at the first meeting of creditors for examination, and openly wore it at that time. When complaint was made about his failure to list it, the schedule was amended by including it, and the controversy is now pending on review of the decision of the referee to determine whether it is exempt or not. This objection would seem to come also under the rule above stated, and what was said by the court in the case of In re Bryant (D. C.) 104 F. 789, i. e., "Where the bankrupt wore a watch and chain upon his person at the hearing of his creditors, such would not constitute concealment so as to defeat his discharge." For these reasons this objection must also be overruled.

■ It is further charged that the bankrupt withheld from his schedule and endeavored to conceal approximately 100 head of steers belonging to him, and which he transferred to Philomene Servel for the purpose of defrauding his creditors, and concealed about 4,000 head of sheep and changed the brand on about 1,100 head. The inquiry arises under this objection as to how many cattle were owned by the bankrupt, and what became of them. There is some conflict in the evidence as to that. It is not clear from the testimony of the objectors as to what was the total number of cattle owned and disposed of by the bankrupt. However, in the fall of 1925 the bankrupt purchased quite a number of cattle, part at Thayne, Wyo., and part in the Raft River country, amounting to about 690 head, and his explanation as to what became of them, together with other evidence, convinces me that he has given in his schedule about as correct account of these cattle as he could.

As to whether or not the bankrupt owned the 4,000 head of sheep complained of, the testimony offered by objecting creditors is very unsatisfactory and does not clearly establish the fact. While there was testimony that the bankrupt at times gave a statement to the bank, and that in certain mortgages which were by Kasiska foreclosed he stated he had a number of sheep greater than was found after the foreclosure, yet he explains that he did not at the time own more than 15,000 head of matured sheep, and the remainder stated in the statement were ewes and lambs, and that the mortgages to Kasiska were duplicates and covered the same sheep. It seems that the statement and mortgages were prepared by other parties for the bankrupt. The proof is lacking to establish that approximately 4,000 head of sheep were found in the herds of other people or removed, or that the 100 head of steers were concealed. In re Lesser (C. C. A.) 114 F. 83.

■ The claim is further made that the bankrupt, in the fall of 1926, caused to be brought to the ranch of Philomene Servel 1,100 head of his sheep, upon which the brand had been changed from JS to ℗Ⓢ and mixed them with hers. Here again we are confronted with a conflict in the proofs, some testifying that they saw some of these sheep at Philomene Servel's ranch with the brands changed, and others, who were disinterested and who helped feed and lamb the sheep, that they were not there. The testimony of the witnesses for the bankrupt was more direct and certain, and preponderated in favor of the conclusion that these sheep were not mingled with those of Philomene Servel.

■ The evidence relating to the charge that for the purpose of defrauding his creditors the bankrupt transferred to Pierre Servel the Tyhee ranch and omitted it from his schedules establishes that some six years ago the bankrupt was indebted to his brother, Pierre Servel, the husband of Philomene Servel, and as part payment of that indebtedness he finally conveyed this ranch to Pierre Servel. This land is included in his schedule, and reference is made that the widow of Pierre Servel claimed the property, and that it was then pending in litigation over its ownership be-

tween H. L. Corbett, one of the objecting creditors, and Philomene Servel. Thereafter the state court decreed that Philomene Servel was the owner of the land, and that the bankrupt had no interest therein. Under these facts, together with the fact of the transfer having been made more than two years from the filing of the petition in bankruptcy, there was no concealment of property belonging to the bankrupt. In re Dauchy (C. C. A.) 130 F. 532.

As to the charge that the bankrupt made a false oath in his testimony at the first meeting of creditors, it is not clear that such was the case. It appears that his examination was somewhat lengthy and covered a great many matters. The inquiry then is, does the testimony disclose an intent to make false and misleading statements? Taking his testimony as a whole, I am unable to infer therefrom any intent upon his part to mislead or falsify.

The objection that the bankrupt made a false statement in writing relative to his indebtedness and net worth for the purpose of obtaining credit from the National Bank of Idaho must be confined to an attempt upon his part to obtain credit from that bank, as that is the charge made. The evidence showed that he did not, at the time of making the statement, attempt to secure or ask for any loans or credit from the bank. The mere fact of giving the statement to Kasiska, one whom he had considerable dealings with, does not, under the evidence, sustain the charge that it was given for the purpose of obtaining credit from the bank. It is evident that the statement was made and given to Kasiska for his own information, and had nothing to do, so far as the evidence is concerned, with obtaining any money or property from the bank. Before this objection could be sustained, it must appear that he obtained money or property upon the false statement in writing from the bank. In re Kahn (D. C.) 16 F.(2d) 501.

The last objection to be considered is the charge that the bankrupt failed to schedule and thereby concealed certain state leases and a grazing right on Cottonwood. These leases and grazing right were not included in the schedule, but the bankrupt says that his reason for not doing so was that they were subject to cancellation because payment of them had not been made, and he thought they were of no value or further belonged to the estate. When his attention was called to his right to assert title thereto, he did so, and, through his attorney, caused them to be scheduled as an asset of the estate. Here is an-

other instance where it was the belief of the bankrupt that he did not own the property, and, that being so, the evidence is lacking to establish fraudulent intent to conceal property. An honest mistake in law will excuse failure to list property. The bankrupt thought under the law that he had forfeited all right to the leased property. Remington on Bankruptcy, vol. 1, sec. 3241; In re Hirsch (D. C.) 97 F. 571.

Considering the objections and evidence as a whole, there is not that degree of proof necessary to establish the existence of any one of the objections against the discharge. While there might be room for suspicion that the bankrupt may have attempted to conceal property, evidence of it amounts to nothing more than suspicion, and I feel that all the objections should be overruled and the petition for discharge granted.