In re Alex KRAUSE, Jr. a/k/a Alexander John Krause, Jr. and Rhoda E. Krause, Individually, Jointly and as Tenants by the Entireties, Bankrupts.

Reuben RIFKIN, Plaintiff,

v.

Alex KRAUSE, Jr. and Rhoda Krause, Defendants.

Bankruptcy No. 78–238EG.

United States Bankruptcy Court, E. D. Pennsylvania.

Jan. 9, 1980.

Michael S. Silberman, Blue Bell, Pa., for bankrupts/defendants.

B. David Gray, King of Prussia, Pa., for plaintiff.

James W. Adelman, Adelman & Lavine, Philadelphia, Pa., for trustee.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

There are two complaints before us in the case at bar. The first raises objections to the bankrupts' discharge under Section 14c of the Bankruptcy Act. The second seeks a determination of the nondischargeability of the debt owed by the bankrupts to the objecting creditor under Section 17a of the Act. We conclude that there is not sufficient evidence to support the complaint objecting to the discharge of the bankrupts under Section 14c and, therefore, we will grant the bankrupts a discharge. Similarly, we find that there is not enough evidence to support a finding that the debt in question is nondischargeable pursuant to Section 17a and, therefore, conclude that the debt is discharged.[1]

Alex Krause, Jr. ("Krause") and Rhoda Krause, his wife, were the sole stockholders in a corporation known as Alex Krause, Jr., Inc. ("the corporation") which was formed to market precious and semi-precious gems and items of jewelry. In June, 1975, Reuben Rifkin ("Rifkin"), an acquaintance of Krause, lent Krause $50,000 so that Krause could pay off the current liabilities of the corporation and thus concentrate on a "Russian" deal, a venture whereby a rare synthetic stone, canasite, was to be distributed through the corporation. The "Russian" deal fell through and Krause failed to repay the loan when it became due on December 31, 1975. Rifkin thereupon threatened to take legal action. To forestall such action, Krause and his wife, on April 14, 1976, after negotiations with Rifkin, on behalf of the corporation and themselves, granted Rifkin a security interest in their present and future individual inventories as well as in that of the corporation. Financing statements covering the inventory were filed to perfect the security interest and a payment schedule was drawn up whereby the Krauses agreed to pay Rifkin $615 per week for two years until the debt of $50,000, plus interest, was repaid. The Krauses made only three payments before defaulting on their note.

Meanwhile, Rifkin continuously sought to obtain from the Krauses a written inventory of the corporation's gems, an inventory which had been promised to him by the Krauses when the security agreement was executed. During that time, Krause continually stated to Rifkin that the value of the inventory was from $300,000 to $400,000, at cost. On the basis of those representations, and because Krause told Rifkin that the Internal Revenue Service would close down his business if withholding taxes were not paid, Rifkin lent Krause an additional $2,212.24 on August 23, 1977.

Finally, in August, September and October of 1977, Krause gave Rifkin some inventory sheets which he represented to be part of the gem inventory possessed by the corporation at that time. Although most of the items listed had no values placed beside

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

them, Krause stated that the value of this inventory was still between $300,000 and $400,000.

In December, 1977, Rifkin foreclosed on his security interest and took possession of the gem inventory on the premises of the corporation. At that time another written inventory was taken by Krause and Rifkin together. This inventory was subsequently appraised by a court-appointed appraiser and has been stipulated by the parties to be worth approximately $20,000 at dealers' cost.

On February 28, 1978, two petitions in bankruptcy were filed, one by Krause and his wife, and the other by the corporation. There are no significant assets available to satisfy either the corporate or individual unsecured liabilities of the bankrupts. While the corporation was discharged in bankruptcy without objection on September 19, 1978, Rifkin filed one complaint on October 26, 1978, objecting to the discharge of the Krauses under Section 14c, and another complaint seeking a determination of the nondischargeability of the debt owed by the Krauses to him under Section 17a.

### 1. The Objections to Discharge under Section 14c.

Rifkin's complaint states that a discharge should not be granted to the Krauses because:

(a) [They] destroyed, mutilated, falsified, concealed, or failed to keep or preserve books of account, or records, from which their financial position and business transactions might be ascertained;

(b) [They] obtained money or property on credit, or obtained an extention [sic] or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a material false statement in writing respecting their financial condition;

(c) [They] have concealed their property with intent to hinder, delay, and/or defraud their creditors;

(d) [They] have failed to explain satisfactorily any losses of assets or deficiency of assets to meet their liabilities.[2]

These grounds are based generally on Section 14c(2), (3), (4), and (7) of the Bankruptcy Act which provides that the court shall grant a discharge unless satisfied that the bankrupt has committed any of the enumerated acts.[3] After reviewing all of the evidence presented at the five hearings held in this action, we are not convinced that the plaintiff, Rifkin, has proven by a preponderance of the evidence that the bankrupts have committed any of the alleged acts, and, therefore, we will grant the discharge of the Krauses.[4]

With respect to the first allegation in the complaint which is based on Section 14c(2),[5] there is not one shred of evidence that the Krauses destroyed, mutilated, or falsified any of their business or financial records. Nor is there any evidence that the

---

**2.** Complaint of Reuben Rifkin objecting to the discharge of Alex Krause, Jr., and Rhoda Krause filed October 26, 1978.

**3.** 11 U.S.C. § 32c (1978).

**4.** Under Rule 407 of the Rules of Bankruptcy Procedure, the plaintiff in a trial on a complaint objecting to discharge has the burden of proving the facts essential to his objection. This has been interpreted to mean that the plaintiff must make out a prima facie case to withstand a motion to dismiss and, on all the evidence of the case, must sustain a charge against the bankrupt by the preponderant weight of the evidence as is the rule in most civil cases. *See* 12 Collier on Bankruptcy Ch. 407, ¶ 407.3 (14th ed. 1978). The Court of Appeals for the Third Circuit interpreting Rule 407 in a recent case, *In re Decker*, 595 F.2d 185 (3d Cir. 1979) held that a trial judge "is not compelled to accept a

plaintiff's testimony even if contradicted. The plaintiff has the burden of proof and the trial judge may find that the testimony does not carry that burden." *Id.* at 190, *quoting Santana v. United States*, 572 F.2d 331, 335 (1st Cir. 1977).

**5.** Section 14c(2) states that:

c. The court shall grant the discharge unless satisfied that the bankrupt has . . . (2) destroyed, mutilated, falsified, concealed, or failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained, unless the court deems such acts or failure to have been justified under all the circumstances of the case.

11 U.S.C. § 32c(2) (1978).

**156**

Krauses failed to keep adequate records of their business activities. Further, there is no evidence that the Krauses concealed from this court or from any of their creditors any of their financial records.[6] In fact, it is clear from the evidence that the objecting creditor, Rifkin, never asked to look at the Krauses' books or the books of the corporation and was never denied an opportunity to do so. The plaintiff's allegation appears to be based on the theory that the Krauses' failure to promptly provide Rifkin with a written inventory constitutes a ground for a denial of the bankrupts' discharge under § 14c(2). The failure of the bankrupts to compile such a written inventory at the request of a secured creditor, made two years before the filing of the petition in bankruptcy, while never refusing to let that creditor inspect the bankrupts' books, is not, in our opinion, a ground for denying the bankrupts discharge under Section 14c(2). Such a failure by the bankrupts does not constitute any of the acts of destruction, mutilation, falsification, concealment, or failure to keep records that are enumerated in Section 14c(2) and, therefore, the discharge of the Krauses is not barred by Section 14c(2).

■ With respect to the second allegation based upon Section 14c(3),[7] the evidence is uncontroverted that no writing, false or otherwise, relating to the financial condition of the Krauses or of the corpora-

tion was given to Rifkin prior to the $50,000 loan in June, 1975, or prior to the agreement extending the time for repayment of the loan in April, 1976.[8] The evidence shows that prior to receiving the $50,000, Krause made several oral statements respecting his financial condition.[9] However, the only written statement given by Krause to Rifkin at that time was a piece of paper listing some of the creditors of Krause. Rifkin testified that, taking a quick glance at the paper, he saw about $25,000 listed as owed to various people.[10] There was no evidence presented, however, to prove that that list was false in any way (i. e., that the debts listed were not, in fact, owed or that Krause represented that the list was a complete one when, in fact, it was not).[11] Therefore, we must conclude that the list shown to Rifkin was not a materially false statement in writing respecting Krause's financial condition made by Krause to obtain the $50,000 loan from Rifkin. Since no other writings were given to Rifkin by Krause prior to or contemporaneous with obtaining the loan, we find that Krause did not commit any of the acts enumerated in Section 14c(3) in obtaining the $50,000 from Rifkin.

Similarly, there is no evidence that Krause gave Rifkin any written statements at the time when the extension of the loan and the security agreement were being ne-

---

**6.** *See* 1A Collier on Bankruptcy § 14, ¶ 14.33 (14th ed. 1978) which states that:

> Under Rule 407 the plaintiff has the burden "*of proving the facts essential to his objection.*" Accordingly, the plaintiff will be required to go beyond a showing of "reasonable grounds" and adduce proof of the facts which will establish that the bankrupt has committed the act charged before the burden of going forward with the evidence will shift to the bankrupt.

*Id.* at p. 1373. Since, as we have found above, the plaintiff in the instant case has offered no evidence that the bankrupts committed any of the alleged acts, the plaintiff has failed to sustain his burden of proof.

**7.** Section 14c(3) states:

> c. The court shall grant the discharge unless satisfied that the bankrupt has . . . (3) while engaged in business as a sole proprietor, partnership, or an executive of a corpora-

tion, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation . . . . .

11 U.S.C. § 32c(3) (1978).

**8.** Section 14c(3) makes it clear that the false statement must be in writing. *Id. See* 1A Collier on Bankruptcy § 14, ¶ 14.38 (14th ed. 1978).

**9.** *See* N.T. at 215–19.

**10.** *See id.* at 216.

**11.** *See id.* at 216–19, 283–87, 325–39, 401–02.

gotiated.[12] Therefore, we find that Krause did not commit any of the acts enumerated in Section 14c(3) in obtaining the agreement from Rifkin to extend the time for repayment of the $50,000 loan.

There is a question, however, with respect to the circumstances of the $2,212.24 loan which Rifkin made to Krause on August 23, 1977. That loan was apparently made on the same day that Rifkin received the first written inventory from Krause.[13] The question presented is whether that inventory is a materially false written statement pertaining to the Krauses' financial condition which induced Rifkin to make that loan. Although there was evidence presented that the written inventory of August 23, 1977, was false, in that the values placed on the gems were too high,[14] we conclude that Krause did not commit any act within § 14c(3) because we find that Rifkin did not rely on that inventory in making his decision to loan the $2,212.24 to Krause.[15] This finding is based on the fact that no evidence was presented that Rifkin relied on the written inventory or even that Rifkin received or read that inventory before deciding to loan Krause the money.[16] In fact, Rifkin testified in detail about the reasons he lent Krause the $2,212.24 and reliance on the written inventory was not among them.[17] Therefore, we conclude that Rifkin did not rely on the written inventory and, consequently, we conclude that Krause did not obtain the $2,212.24 by making a materially false statement in writing respecting his financial condition upon which statement Rifkin relied.

It was also alleged that the postponing of foreclosure by Rifkin in the fall of 1977, was an extension of credit by Rifkin which was induced by the false written inventories which Rifkin received from Krause. To fit within Section 14c(3) it must be shown that the creditor, Rifkin, actually relied on the false written statements in deciding to extend credit to the bankrupt.[18] In the instant case, although there was enough evidence introduced from which this court could conclude that the written inventories were false,[19] from the evidence presented we must conclude that Rifkin did not rely on those written inventories in making his decision to postpone foreclosure.

Rifkin testified at length as to his reasons for not foreclosing immediately on Krause's default. He stated that those reasons were: that he had strong personal feelings for Krause,[20] that Krause represented orally that partners would be joining his business thereby giving him the cash with which to repay Rifkin,[21] that Krause made oral promises to repay the loan,[22] that Krause orally represented his inventory to be worth between $300,000 and $400,000[23], while orally representing that his liabilities were under 40,000[24] and that Krause agreed to furnish Rifkin with a complete written in-

---

12. *See* N.T. at 226–30 and 258–73.

13. *See id.* at 236 and 248–49.

14. *See id.* at 365.

15. *See Morimura, Arai & Co. v. Taback*, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586 (1929), rev'g 21 F.2d 161 (3d Cir. 1927). *See also*, 1A Collier on Bankruptcy § 14, ¶ 14.39 (14th ed. 1978). Collier states:

> It was never the intention of Congress to extend clause (3) [of Section 14c] to all cases of false written statements where credit happens to have been given. It should be confined to cases where the decision to give credit was induced by the false statement, which must have been, if not the moving cause behind the giving, extending or renewal of credit, a contributing cause, i. e.: the

> lender or seller must to an extent at least have relied upon it.
> *Id.* at p. 1388.

16. *See* N.T. at 248–49.

17. *See id.*

18. *See* note 15 supra.

19. *See* note 14 and accompanying text *supra*.

20. *See* N.T. at 232, 235 and 242.

21. *See id.* at 238–39 and 242–43.

22. *See id.* at 235.

23. *See id.* at 230, 236, 240 and 242–43.

24. *See id.* at 235.

ventory.[25] At no time did Rifkin testify that he relied on the written inventories that he received in deciding not to foreclose.[26] Therefore, we conclude that there were no false written statements within Section 14c(3) on which Rifkin relied on deciding to postpone foreclosure after Krause's default on that note and security agreement.

Therefore, on the basis of the above, we find that the evidence does not support a finding that the Krauses at any time obtained for their business money on credit, or as an extension or renewal of credit, by making a materially false statement in writing respecting their financial condition or the financial condition of their business, and, therefore, we must conclude that they committed no acts within Section 14c(3) which would bar their discharge.

■ With respect to the third allegation of the complaint which is based on Section 14c(4),[27] we find that there is absolutely no evidence that the Krauses concealed any of their property, within one year of their filing in bankruptcy, with any intent to hinder, delay, or defraud their creditors. The evidence presented was that Krause had represented to Rifkin during the year prior to the filing of Krauses' petition in bankruptcy that the inventory of the corporation was worth between $300,000 and $400,000 [28] while the inventory that was actually obtained by Rifkin on foreclosure was only worth about $20,000.[29] Although such a discrepancy might support a finding that the bankrupt had concealed some of his assets,[30] we must conclude in this case that the discrepancy is the result of Krause's having originally misrepresented to Rifkin the value of the inventory. This conclusion is based on the evidence of the numerous other misrepresentations that Krause made to Rifkin,[31] as well as the lack of any evidence that any particular asset had been concealed.[32] Therefore, we conclude that

**25.** *See id.* at 232.

**26.** *See id.* at 232–243. In fact, Rifkin's testimony seemed to indicate that he was not at all satisfied at that time with the written inventories which he received from Krause because they were incomplete and failed to give any value for many of the gems that were listed. *See id.* at 233 and 240. Even had Rifkin testified that he did rely on those written inventories in deciding *not to foreclose*, we would have found that testimony unbelievable because of the fact that those inventories were so incomplete. *See* exhibits P–8, P–10, and P–11. A reasonable creditor, even one with Rifkin's naivete, could not have relied upon such an "inventory" where the majority of the items listed had no value placed on them. Further, the time sequence of events would lead us to conclude that Rifkin did not rely on the *written* inventories in deciding to postpone foreclosure: Krause defaulted on the note sometime in May of 1976, the written inventories were received in August, September, and October of 1977. Rifkin postponed foreclosure over a year without written inventories and foreclosed only a few months after receiving those inventories. Therefore, it would be hard to conclude Rifkin relied on those inventories even if he had so testified.

**27.** Section 14c(4) states:
   c. The court shall grant the discharge unless satisfied that the bankrupt has . . . (4) at any time subsequent to the first day of the twelve months immediately preceding the fil-

ing of the petition in bankruptcy, transferred, removed, destroyed, or cancelled, or permitted to be removed, destroyed, or cancelled, any of his property, with intent to hinder, delay, or defraud his creditors . . . . .
11 U.S.C. § 32c(4) (1978).

**28.** *See N.T.* at 226, 230, 236, 240, and 242–43.

**29.** *See id.* at 369.

**30.** A discrepancy between what the bankrupt has in assets upon the filing in bankruptcy and what the bankrupt has previously manifested himself to be worth would probably support a bar to discharge under Section 14c(7) rather than 14c(4). *See* 1A Collier on Bankruptcy § 14, ¶ 14.59 (14th ed. 1978). A finding under Section 14c(4) to bar discharge appears to require evidence that a particular, identifiable asset has been concealed. *See e. g., In re Hochberg,* 17 F.Supp. 916 (W.D.Pa.1936). *See also,* 1A Collier on Bankruptcy § 14, ¶ 14.45 (14th ed. 1978).

**31.** Such misrepresentations included: that the liabilities of the corporation were under $40,-000 (N.T. at 235), that partners would be joining the business (N.T. at 238–39 and 242–43), and that a complete written inventory would be furnished (N.T. at 232).

**32.** There was some reference at the hearings in this case to the effect that a tray of diamonds had been concealed. However, *the only evi-*

there is insufficient evidence from which we may conclude that the Krauses concealed any of their assets. Hence, their discharge is not barred by Section 14c(4).

With respect to the fourth allegation which is based on Section 14c(7),[33] we find that the objecting creditor, Rifkin, did not meet his burden of proof. In order to prove a bar to discharge under Section 14c(7), the objecting creditor must prove that the bankrupt was called upon to explain losses of assets or a deficiency of assets to meet his liabilities and that he failed to do so or failed to do so satisfactorily.[34] Once that is proven, the burden shifts to the bankrupt to explain satisfactorily that loss.[35] In the instant case, the objecting creditor, Rifkin, did not offer any evidence that the Krauses had been called upon and failed to explain any losses at any time during the bankruptcy proceeding. Nor did Rifkin ask the Krauses to explain any losses at the five hearings held on the instant complaint. In fact, no loss was even identified as needing explanation other than the "apparent" loss evidenced by the fact that the inventory received by Rifkin on foreclosure of his security interest was valued at $20,000, while Krause had continually represented its worth to be between $300,000 and $400,000. As stated above, we believe that this evidence shows that Krause misrepresented the value of that inventory, *not* that some of that inventory has disappeared.[36] Therefore, we must

conclude that there is no evidence to support a finding that the Krauses failed to explain satisfactorily any losses of assets or deficiency of assets to meet their liabilities.

Having thus found that there is not enough evidence to support a finding that the Krauses committed any of the acts enumerated in Section 14c(2), (3), (4), or (7), we conclude that they are entitled to a discharge and will so order.

2. *The Nondischargeability of the Debt Owed to Rifkin under Section 17a(2).*

In his second complaint, Rifkin alleges that the debt owed to him by the Krauses as a result of the $50,000 loan is nondischargeable pursuant to Section 17a. This is in the form of an allegation that the "debt by defendant to the plaintiff was obtained fradulently [sic] by the defendants, that the defendants have concealed their assets preventing plaintiff from collecting the aforementioned debt, that the defendants have purposely avoided the keeping of proper books and records to explain the inability to pay the plaintiff the aforementioned obligation."[37]

The only section under which the allegation might fit is Section 17a(2) which states:

a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false

---

33. Section 14c(7) states:
c. The court shall grant the discharge unless satisfied that the bankrupt has . . . (7) has failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities . . . .
11 U.S.C. § 32c(7) (1978).

34. See 1A Collier on Bankruptcy § 14, ¶ 14.59 (14th ed. 1978).

35. Id.

36. See notes 30–32 and accompanying text *supra*.

37. Complaint of Reuben Rifkin for a determination of the dischargeability of a debt, filed October 26, 1978.

dence introduced to prove that was testimony that it was listed on one of the written inventories given to Rifkin by Krause. See N.T. at 241–42 and exhibit P–8 at p. 3. Rifkin testified that he had never actually seen that tray but that Krause had said it was out on consignment. N.T. at 242. Rifkin's son, David Rifkin, also testified that Krause said he had some diamonds in a safe; but, again, David Rifkin had not seen any of them. Id. at 273. Krause was never asked whether the tray of diamonds ever existed and, in fact, he testified that he had stopped dealing in diamonds a year prior to his bankruptcy. Id. at 190. There being no other evidence that such a tray existed, we conclude that the entry in the written inventory was merely another misrepresentation by Krause of the value of the inventory made in an effort to induce Rifkin not to foreclose.

representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another  .  .  .  .[38]

As noted above with respect to the allegation under Section 14c(3),[39] we find that there is no evidence that the Krauses gave a false writing respecting their financial condition to obtain money or an extension of credit from Rifkin. Therefore, to find the debt nondischargeable under Section 17a(2), we must find that the Krauses "obtain[ed] money or property by false pretenses or false representations." [40]

According to the evidence presented, the only representation made by Krause to Rifkin prior to obtaining the $50,000 loan was that the money was going to be used to pay off the corporation's creditors so that Krause could concentrate on the "Russian" deal.[41] Although there is no evidence that this money was ever, in fact, used to pay off the corporation's creditors, there was also no evidence presented that that representation was false when it was made[42]

—that is, that at the time it was made, Krause had no intention of paying off any creditors. Thus, we conclude that Krause did not obtain that loan by false pretenses or false representations.[43]

■ With respect to the extension of the time for repayment of the $50,000, there is evidence that Krause made oral misrepresentations as to the value of the corporation's inventory. However, obtaining an extension of the time for repaying a loan is not "obtaining money or property" within the meaning of the first clause of Section 17a(2) but rather falls within the second clause of that section—"obtaining an extension or renewal of credit"—for which a false *written* statement is required to make the debt nondischargeable.[44] And, as found above, in the instant case there was no false written statement given by Krause to Rifkin to obtain the extension of time.[45]

Thus, we conclude that there is no evidence that the Krauses obtained the $50,000 loan from Rifkin by false pretenses or false representations *so as to* render that debt nondischargeable under Section 17a(2).

38. 11 U.S.C. § 35a(2) (1978).

39. *See* notes 7–26 and accompanying text *supra*.

40. 11 U.S.C. § 35a(2) (1978).

41. *See* N.T. at 215–21, 283, and 325. Although Rifkin did testify on redirect that Krause had told him that the inventory was worth between $300,000 and $400,000 *prior* to Rifkin's lending Krause the $50,000 (*id.* at 290), Rifkin did not mention that representation during his extensive direct and cross-examination. *Id.* at 209–51, and 283–90. Further, Krause testified that he made no such representation prior to obtaining the loan, although he admitted that he had made representations about the inventory's value at a later date. *Id.* at 338. Since the direct and cross-examination of Rifkin was very extensive with respect to the circumstances of the $50,000 loan and nothing was mentioned with respect to any representation by Krause as to the value of the inventory, we are inclined to disbelieve the testimony of Rifkin on redirect. Therefore, we find as a matter of fact

that Krause made no representations as to the value of his inventory prior to obtaining the $50,000 loan from Rifkin.

42. *See* 1A Collier on Bankruptcy § 17, ¶ 17.-16[3] (14th ed. 1978).

43. Although evidence was presented that Krause made false oral representations (that the corporation's inventory was worth between $300,000 and $400,000) *prior* to obtaining the $2,212.24 loan from Rifkin on August 23, 1977, Rifkin's complaint does not request that that debt be held nondischargeable pursuant to Section 17a(2). Therefore, since an application for a determination of the dischargeability of that debt was not timely filed, that debt is also discharged. *See* 11 U.S.C. § 35c(2) (1978).

44. *See* 1A Collier on Bankruptcy, § 17, ¶ 17.-16[2] at p. 1631 (14th ed. 1978).

45. *See* notes 12 and 18–36 and accompanying text *supra*.